MESSONNIER *against* KAUMAN, GOMPERTS, and others.

*G.* assigned a cargo and the proceeds, &c. to *K.* in trust, for the benefit of *K.* and *M.*, but *M.* was to be *first* secured and satisfied for his advances to *G.* to enable *G.* to pay certain bills accepted by him, drawn and negotiated by *M.*, to pay for the cargo, &c. *G.* and *K.*, afterwards, with the assent, as they alleged, of the agent of *M.*, but without the knowledge or consent of *M.*, *cancelled* the deed of assignment, which was dated the 7th of *February;* and executed another deed of assignment on the 28th of *February*, to *K.* and *S.*, in trust, to pay *M.* and *K.*, and certain other creditors named therein *;* and in case the fund proved insufficient to pay all the debts specified, that then it should be distributed rateably, between *M.*, *K.*, and the other creditors named, in proportion to their respective demands; and the fund eventually proved insufficient to pay all the debts specified in the second assignment :

*Held*, that the cancelling of the *first* assignment by *G.* and *K.* was fraudulent, as regarded the plaintiff *M.*, who was, therefore, entitled to the full benefit of that assignment, and must be first and exclusively paid, out of the fund, his whole demand; and that the second assignment, so far as it was inconsistent with the first, or as to the right of the plaintiff to be first paid, was void.

THE bill was filed by the plaintiff against *Gompert S. Gomperts, Israel B. Jacobs* and *Seixas Nathan*, partners in trade at *New-York*, under the firm of *Gompert S. Gomperts & Co., Joseph Kauman, S. Jones, jun.*, and certain creditors of *G. S. G. & Co.* The bill stated, that on the 12th of *December*, 1810, *G. Seixas*, the agent of *G. S. G. & Co.* applied to the plaintiff, (who is a merchant residing at *Baltimore*,) to aid him by his credit and indorsements, in loading the ship *Eastern Star*, then at *Baltimore*, which the plaintiff consented to do. The agent of *G. S. G. & Co.* accordingly, drew five bills of exchange, at 60 and 90 days, amounting to 14,090 dollars, and another bill for 904 dollars, for disbursements and commissions, on *G. S. G. & Co.*, in favour of the plaintiff, and indorsed by him, which six bills were accepted by *G. S. G. & Co.*, and the vessel sailed on her voyage with a cargo purchased with the aid of the five bills. Before any of the bills became payable, the defendant *Kauman*, in behalf of *G. S. G. & Co.*, by

1817.

MESSONNIER
v.
KAUMAN.

letter, dated *January* 31st, 1811, applied to the plaintiff, and in their name, promised that if the plaintiff would forward the necessary funds to *K.* to enable him to take up the bill for 904 dollars, payable the 5th of *February*, and the bills for 4,000 dollars, and 1,900 dollars, payable on the 14th and 20th of *February*, *G. S. G. & Co.* would regard the claim of the plaintiff as privileged; and *K.* offered, in their name, as security, to make over to the plaintiff, the outward cargo, and the return cargo, or proceeds of the ship *Eastern Star*, with the policies of insurance, &c. The plaintiff, in his answer, promised to accede to this proposal, provided *G. S. G. & Co.* would make over to him the ship, as well as the cargo, &c. to secure his whole claim, or all the bills, amounting to 14,985 dollars, with interest, and in the mean time, to prevent delay, the plaintiff authorized *K.* to take up the bill for 904 dollars, and to draw on the plaintiff for the amount, at sight, which was done, and the sum paid by the plaintiff accordingly. That afterwards, *K.* by letter, dated 6th of *February*, 1811, after he had advanced the 904 dollars to *G. S. G. & Co.* informed the plaintiff, that he (*K.*) was endorser for them, and that the transfer of the cargo and proceeds was preparing for the joint benefit of *K.* and the plaintiff, and that *G. S. G. & Co.* declined including the ship in the assignment, and to induce the plaintiff to acquiesce in the change of the terms of security before offered, he expressed his opinion that *G. S. G. & Co.* could now go on to meet their engagements. That on the 7th of *February*, 1811, *G. S. G. & Co.* assigned to *K.* the cargo and proceeds of the ship *Eastern Star*, with the policies of insurance, for the benefit of *K.* and the plaintiff. That on the 9th of *February*, the plaintiff forwarded to *K.* 5,900 dollars, to take up the bills, payable on the 14th and 20th of *February*, endorsed by the plaintiff, and accepted by *G. S. G. & Co.* That when those sums were forwarded to *K.*, the plaintiff did not know whether the assignments were made, and in-

structed *K.* not to deliver the remittances, except upon the transfer of the *ship*, cargo and proceeds, with the policies, &c. That when he found the transfer was for the joint benefit of *K.* and himself, he wrote to *K.*, on the 12th of *February*, stating his objection, and that he must be fully secured, and on those conditions only did he consent to part with his funds. That *K.* by his answer, dated 14th of *February*, assured the plaintiff that he might consider himself completely secured by the transfers made by *G. S. G. & Co.*, and that the claim of the plaintiff was to be *first* satisfied. The plaintiff being satisfied with this assurance, wrote to *K.* on the 19th of *February*, to that effect; and on the 14th of *March*, 1811, at the request of *G. S. G. & Co.* and of *K.*, he remitted to *K.* 8,100 dollars, to take up the remaining bills, thereby becoming a creditor of *G. S. G. & Co.* to 14,985 dollars. That the cargo of the *Eastern Star* arrived safely at *Lisbon*, and was sold for above 30,000 dollars, chiefly for bills on the *British* government, which were paid; and the proceeds had come, or might have come to the hands of the plaintiff, and that the ship returned to *New-York*, with a cargo of salt and cocoa, which *K.* received, and sold for 3,000 dollars, and had also received, or might have received, the freight.

The bill further stated, that the monies so received by *K.*, had not been applied to the benefit of the plaintiff; but *G. S. G. & Co.*, and *K.*, (combining with the other defendants, to deprive the plaintiff of the benefit of the transfer of the 7th of *February*,) had executed, on the 28th *February*, 1811, another deed of assignment to the defendant *K.*, and to *Jones*, of the cargo, proceeds, and freight of the *Eastern Star*, in trust, to pay the expenses of the trust, and to reimburse themselves; then to pay the plaintiff what he had advanced, or should advance to *G. S. G. & Co.* under the agreement aforesaid; and to pay *K.*, and the other defendants, their advances and responsibilities, being about 8,182 dollars and 50 cents, and to pay the de-

fendant, *Jacobs*, a debt of 12,800 dollars; and that if the property assigned was not sufficient for all these purposes, then to distribute the same, rateably, among the plaintiff and the defendants, according to the amount of their respective debts.

The bill charged, that this deed of trust, as far as regarded the property before assigned to the use of the plaintiff, and to entitle him only to a rateable proportion with other creditors, was fraudulent and void; that *K.* was a trustee for the plaintiff under the deed of the 7th of *February*, and had no right or authority to give it up, or cancel it, or to do any act to impair the rights of the plaintiff, who was entitled to be first paid out of the property.

The bill further stated, that on the 13th of *February*, the plaintiff sent *Lewis Pascaulf* to *New-York* with all the correspondence between the plaintiff and *G. S. G. & Co.*, and *K.*, and expressing his dissatisfaction with the letter of the 7th of *February*; and with the intent that *P.* should procure transfers of the *ship*, cargo, and proceeds, with the policies, &c. to the exclusive use and benefit of the plaintiff. That after the departure of *P.*, the plaintiff received the letter of *K.* of the 14th of *February*, assuring the plaintiff, that he was to be first secured and paid, by that deed; to which the plaintiff replied, on the 19th of *February*, expressing his satisfaction, and requesting that the deed might be recorded; and wrote letters to *G. S. G. & Co.*, and *K.*, expressing the object of sending on *P.*; so that all further authority of *P.* was at an end by the acquiescence of the plaintiff, in the assurance of *K.* as to the deed of the 7th of *February*; and that if, as the defendants pretended, the surrender of the deed of the 7th of *February*, and the provisions of the second deed of the 28th of *February*, were approved of by *P.*, as the agent of the plaintiff, *P.* had no authority for that purpose, the object for which he was sent no longer existing; and if he did give such sanction to the second deed, it was procured by imposition

and deceit, as the defendants must have known, after the letter of the plaintiff of the 19th of *February*, expressing himself satisfied with the deed of the 7th of *February*, that *P.* had nothing further to do for the plaintiff, or authority to act for him. That *K.*, by a letter dated the 20th of *February*, stated to the plaintiff, that *P.* and *K.* had agreed to a new transfer of the property to *K.* and *Jones*, in trust, for all the creditors; and that the deed of the 7th of *February* was, therefore, null; to which the plaintiff, by two letters of the 24th of *February*, and received by *K.* the 26th of *February*, expressed his dissent, and adhered to the deed of the 7th of *February*, with the explanations of *K.* of the 14th of *February*. That the cancelling the deed of the 7th of *February*, and the execution of the deed of the 28th of *February*, was after *K.* had received the plaintiffs's two letters of the 24th *February*, and without his consent, and he has never ratified those acts; and that, if any thing has been said or done by the plaintiff to that effect, it has been procured by imposition. The bill then charged various misrepresentations by *K.* to the plaintiff, as to the debts, &c. of *G. S. G. & Co.*, and which the plaintiff showed to be the result of design on the part of *G. S. G. & Co.*, and *K.*, to mislead and deceive the plaintiff, and to induce him to remit the 8,182 dollars to take up the remaining bills. That none of the property assigned by the deed of the 28th of *February* was available, except the bill of exchange taken for the outward cargo, and the proceeds of the homeward cargo; and that *K.* received out of the proceeds, &c. above 30,000 dollars, which he had applied to his own use; and that the plaintiff had not received any thing under the deed of the 7th of *February*, nor had any *pro rata* payment been made to him by *Jones* or *K.*, under the deed of the 28th of *February*; and that *K.* had become insolvent, and was totally unfit to be a trustee.

The bill prayed, that an account might be taken between

1817.

MESSONNIER
v.
KAUMAN.

1817.

MESSONNIER
v.
KAUMAN.

the parties; that the deed of the 28th of *February*, so far as it interfered with the deed of the 7th of *February*, might be declared to be null; and that the plaintiff might have the full benefit of the deed of the 7th of *February*, and be first paid out of the property transferred by that deed; that any payments to any of the defendants, under colour of the deed of the 28th of *February*, so far as the same were inconsistent with the deed of the 7th of *February*, and the letter of *K.* of the 14th of *February*, might be deemed to have been paid in fraud of the plaintiff; and that the monies might be paid over to the plaintiff by such of the defendants as had received them; and that *K.*, on the coming in of his answer, might be ordered to bring into court all monies or securities, or other property received or possessed by him as trustee under the deed of the 7th of *February*, or of the 28th *February* : and for general relief, &c.

The answer of *Kauman*, (and which, by consent, was received as an answer for the other defendants,) admitted that *G. S. G. & Co.* confirmed the negotiation with the plaintiff, by *Seixas*, their agent; that the bills brawn by him, were indorsed by the plaintiff, and accepted by *G. S. G. & Co.*; and that the ship arrived at *Lisbon*, with a cargo purchased with the five bills; that the plaintiff paid all the expenses, &c. which were partly secured by the bill for 904 dollars; and that the plaintiff did all this business for the usual commission, without any lien ont he cargo, or collateral security. That in the latter part of *January*, 1811, *G. S. G. & Co.* stated to the defendant, that they were embarrassed, but solvent, and urged him to write to the plaintiff for his aid in taking up, the three first bills, (amounting to 6,800 dollars;) and that he should remit the money to the defendant, and that they would look on his, the plaintiff's, as a privileged debt; and that he should not suffer; and they offered to the defendant the cargo and proceeds, and policies and freight, to secure the plain-

tiff for such advances and payments. That the plaintiff, by a letter of the 25th of *January*, informed the defendant of his endorsing the five bills, and requested his advice as to the safety of *G. S. G. & Co.* That on the 31st of *January*, the defendant, by letter, applied to the plaintiff for *G. S. G. & Co.*; and the plaintiff, by his answer of the 2d of *February*, said he should take up two of the bills, and requested the defendant to pay the third, of 904 dollars, immediately, and to procure a cession of the ship, cargo, and policies, as security for the 14,985 dollars, with interest. That the defendant applied to *G. S. G. & Co.*, who said the *ship* was not at their disposal, and that they considered the security to be given to extend only to the advances to be made by the plaintiff, and offered to the defendant, who was also an endorser, to assign to him the cargo and proceeds, &c. to secure the plaintiff the reimbursement of the remittances for the *three bills*, and for security of the defendant; and said that they expected themselves to be able to meet the other bills, payable in *March*. That the defendant, and *G. S. G. & Co.*, agreed to such assignment. That on the 6th of *February*, he informed the plaintiff of the agreement; and on the 7th of *February*, the cession was made, which did not cover the outward cargo, and the security extended only to the *February* bills. That this deed of cession was soon after given up to *G. S. G. & Co.* That the plaintiff, by his letter of the 6th of *February*, complained of them, and insisted on a cession of *ship*, cargo, and proceeds, and, at the same time, promised to remit for the *February* bills. The defendant admitted the correspondence between him and the plaintiff, as stated in the bill. That he received from the plaintiff, on the 11th of *February*, 5,900 dollars to pay the *February* bills, with orders not to apply the money, until the plaintiff was fully secured to the amount of all such remittances, and for all his responsibilities for *G. S. G. & Co.* He admitted, also, the explanation of the deed of

cession of the 7th of *February*, made in his letter of the 14th of *February*, that the defendant was to have the surplus only, after payment of the demands of the plaintiff. That the defendant considered that *G. S. G. & Co.* had complied with their engagement, and that the security extended only to the *February* bills, and he, therefore, paid those bills with the money remitted to him by the plaintiff. That *Pascaulf* arrived in *New-York* the 17th of *February*, as the authorised agent of the plaintiff, and applied for a renewed security to the plaintiff alone, and to cover all his responsibilities, which was refused. That. he then demanded that the property assigned should be applied exclusively to the benefit of the plaintiff, which was refused ; but the defendent was willing to agree to it to the extent of the three bills, or 6,800 dollars, but *G. S. G. & Co.* refused, and proposed to make an adjustment with the plaintiff and the other creditors, whose debts were *honorary*, and entitled to a preference ; and in consideration that the plaintiff would take up all his endorsed bills, and the former assignment be annulled, that they would assign the balance of the ship, and policies of insurance on another ship, and the proceeds of the cargo aforesaid, and other property, for the benefit of the plaintiff and others. That *P.*, as agent of the plaintiff, agreed to this proposal, and such assignment was, accordingly, executed on the 28th of *February*, with a schedule of the debts secured, &c. That the defendant, thereupon, with the assent of *P.*, gave up to *G. S. G. & Co.* the first assignment, which was cancelled, and *P.* agreed to the payment of the first three bills, and that the plaintiff should take up the *March* bills. That certain changes in the property to be assigned were made with the assent. of *P.* The answer set out the assignment of the 28th of *February ;* and stated, further, that *G. S. G. & Co.* became insolvent about the 28th of *February*, and applied for the benefit of the insolvent act in *May*, and obtained their discharge in *August*,

1811. That their debts, exclusive of those provided for by the assignment, amounted to 40,000 dollars; and their property, not included in the assignment, was very inconsiderable. The defendant further stated, that the deed of the 7th of *February* was cancelled with the assent of *P.*, under an impression that the assignment of the 28th of *February* would be more beneficial. That the plaintiff would not have been entitled to any preference to the defendant under the first deed, notwithstanding any stipulation of preference by the defendant; nor would the plaintiff have been entitled to payment of more than the three first bills; and that the assignment of the 7th of *February* was of no force, as the plaintiff did not agree to it, but claimed security for all the five bills, and that he should be first paid, which was repugnant to the terms of the deed. That *P.* assumed to be the general authorized agent of the plaintiff, and the defendant was warranted to treat with him as such. The defendant denied all fraud in procuring the assent of *P.*, or that the assignment of the 28th of *February* was fraudulent. He admitted that the plaintiff, on tha 14th of *March*, sent him 8,100 dollars to take up the two last bills; and stated, that *P.* came again to *New-York*, in *May*, 1811, as agent of the plaintiff, and was informed of, and approved of every thing that had been done, and claimed only a rateable proportion under the deed of the 28th of *February*. That on the 29th of *May* the defendant informed the plaintiff of a deficiency in the fund; and that the deed of the 7th of *February* was given up to be cancelled *before* the plaintiff's letters of the 19th and 24 of *February* were received, expressing his dissent to the arrangement; and that the plaintiff did not express his dissent to the surrender of that deed until after the defendant had entered on the execution of his trust under the second deed. That the plaintiff was under no misapprehension of his rights, and did not make the advance of the 8,100 dollars under any ignorance of facts, or of his rights.

The defendant admitted, that he had received under the assignment of the 28th of *February*, 3,132 dollars and 48 cents, from a sale of part of the outward cargo, 14,977 dollars for the British government bills, and 3,615 dollars besides, and had paid certain sums to the custom house, and to certain other creditors, before he knew that the plaintiff had claimed the fund exclusively, and which sums so paid, he prayed might be allowed, and a commission of five per cent. to him. He admitted the right of the plaintiff to a proportional dividend, *pro rata*, with the other creditors named; but only for the three first bills, or 6,800 dollars.

The assignment of the 28th of *February*, recited that the defendant, *Kauman*, and other creditors who were severally named, and the plaintiff, had made advances and incurred responsibilities for *G. S. G. & Co.*, and that the plaintiff had *agreed* to take up the bills payable in *March*, amounting to 8,182 dollars and 50 cents. That *G. S. G. & Co.* had assigned the ship *Eastern Star*, and the policies of insurance to *B. Jacobs*, and also, the policy of insurance on another ship, to secure to *Jacobs* 12,800 dollars, and that the surplus was to be for the benefit of the persons named in this assignment. The cargo of the *Eastern Star*, and proceeds and policies of insurance, and the other property specified in a schedule, were then assigned in trust; 1. to pay the expenses of the trust; 2. to pay the plaintiff the sums he had, or might advance for *G. S. G. & Co.*, and to pay *K.* and the other creditors named, and pay *Jacobs* any deficiency in the security for his debt. 3. In case there should be a deficiency in the fund so as not to pay all the creditors named, including the plaintiff, in full, then all of them, including the plaintiff, were to be paid *pro rata*, according to the amount.

The material part of the evidence consisted in the correspondence between the plaintiff and *Kauman*, the substance of which is stated in the opinion of the court.

*Pascaulf* was examined as a witness for the plaintiff, and *Seixas Nathan,* (who was concerned in the house of *G. S. G. & Co.,*) for the defendants; their evidence, in several particulars, was contradictory.

It was admitted that *Jones,* though a trustee, had done no act, nor received any funds, under the assignment of the 28th of *February ;* and that he never saw or heard of the assignment of the 7th of *February,* until after the execution of the second assignment. That the creditors of *G. S. G. & Co.,* and who are defendants, insist on the benefit of that assignment.

The cause came on to be heard on the 18th of *June.*

*T. A. Emmet,* for the plaintiff, insisted, (1.) on the assignment of the 7th of *February,* and that the plaintiff was fully secured thereby for the whole of his demand, with interest, in preference to the debt of *Kauman.*

2. That *Kauman,* having delivered up that deed of assignment to be cancelled, without the concurrence of the plaintiff, and contrary to his direction, the cancelling of it was a breach of trust, and, as, regards the plaintiff, was fraudulent and void; and that the deed ought still to be considered as existing and in force, for the benefit of the plaintiff, and to the extent of his demand.

3. That it was not competent to the defendants, or either of them, to destroy the plaintiff's right to be first satisfied out of the property so assigned for the plaintiff's benefit.

4. That the general assignment of the 28th of *February,* 1811, so far as it purports to transfer the property comprised in the first assignment, is inoperative and void, as against the plaintiff's prior security, and a fraud on him.

5. That the assignment of the 28th of *February* was never assented to by the plaintiff; and any apparent acquiescence in it, on his part, was the result of misrepre-

sentations on the part of *K.*, and of the plaintiff's ignorance of its provisions, and his own previous rights.

6. That under the general assignment, so far as it may be deemed valid and operative, the plaintiff is entitled to be paid *pro rata* with the other creditors named, on the whole amount of his advances.

7. That the defendant, *Kauman*, on account of his misconduct and breach of trust, was responsible to the plaintiff for his whole debt.

*S. Jones, jun.* for the defendants, contended, 1, That the deed of the 7th of *February*, 1811, was never perfected and made absolute and binding on the parties; but if it was binding, the plaintiff was entitled, out of the funds assigned, to no more than a reimbursement for his *advances* to *G. S. G. & Co.*, to enable them to take up the bills payable in *February.*

2. That the deed of the 7th of *February*, 1811, if of any force, was relinquished and annulled by the mutual consent of the parties.

3. That the deed of the 28th of *February*, executed by *G. S. G. & Co.*, was accepted by the plaintiff as his security for his advances.

4. That *F. Pascaulf*, was the agent of the plaintiff, and had competent authority to act for the plaintiff, in the premises, and that his acts bind the plaintiff.

5. That the cancelling of the deed of the 7th of *February*, was agreed to by *Pascaulf*, the agent, and his act afterwards acquiesced in by the plaintiff.

6. That the deed of the 28th of *February* was agreed to by the agent of the plaintiff; and the same was afterwards confirmed and adopted by the plaintiff.

7. That part of the fund, having been parted with by *Kauman*, the acting assignee, under the deed of the 28th of *February*, after the recognition thereof by the plaintiff, and before notice of any objection on his part, it is now

to late to call it in question, or to set up the deed of the 7th of *February*.

8. That the deed of the 7th of *February* having been cancelled, and the property and funds therein mentioned, being assigned to, and vested in *K.* and *J.* by the deed of the 28th of *February,* for the benefit of the plaintiff and other creditors, the deed of the 7th of *February* cannot now be set up to the prejudice of the creditors provided for by the second deed.

THE CHANCELLOR. The decision of this case depends upon the question, whether the plaintiff is entitled to be paid under the assignment of the 7th of *February,* in exclusion of the other creditors; or whether that deed being duly cancelled, he can only come in for his *pro rata* dividend, under the trust of the 28th of *February,* 1811.

The assignment of the 7th of *February* was from *G. S. G. & Co.* to *Kauman,* for the benefit of *K.* and the plaintiff, of the proceeds of the cargo of the ship *Eastern Star,* on the outward voyage, and of the policies on the cargo and freight. It was an assignment under hand and seal.

This assignment does not specify the particular debts for which the assignment was made. It is general, and would, of course, entitle the assignees to hold the property as a security for all their then existing demands and responsibilities. It would entitle the plaintiff to hold the property in pledge for his reimbursement and indemnity, in supplying the cargo of the ship, and endorsing the five bills of exchange which had been drawn on *G. S. G. & Co.,* and accepted by them. The plaintiff had an equitable pretension, superior to that of any other creditor, (for none had then acquired any actual legal lien) to be indemnified out of the proceeds of the very cargo which he himself had furnished. If we attend to the history of the facts which led to this assignment, we shall find that the plaintiff claimed it, and expected it to be made for his

1817.

MESSONNIER
v.
KAUMAN.

October 1.

benefit *exclusively,* and to the extent of his whole demand. The proposition came from the debtors themselves.

A letter from *K.,* of the 31st of *January,* 1814, mentions, that *G. S. G. & Co.* had applied to him to procure from the plaintiff aid to enable them to take up the three *February* bills; and what did they promise as a consideration for this aid? They said that they would then look upon *the plaintiff's claim* as a privileged one, and that *in no case whatever would they suffer him to be injured by them ;* and they offered, as a security *for his advances as above stated,* to make over to him the proceeds of the outward cargo, with the policies.

The offer in this letter is a' little equivocal, and if not designed as security for his *whole* demand, would be apt to mislead the plaintiff, especially considering him as a foreigner not well versed in the import of terms in our language. It promises him, in the first place, that *his claim* shall be privileged. This would lead any person of ordinary understanding, to suppose they meant his whole debt, and especially when they added that he should never suffer by them. But, afterwards, they offer the proceeds as security for his *said advances,* which, perhaps, strictly considered, would apply only to the special aid then called for. The plaintiff, however, construed the offer in a larger sense. By his answer of the 2d of *February,* he accedes to the proposal, but evidently understands the proposal to be, that the *ship,* as well as cargo, was to be assigned, and that the assignment was to cover his *whole* demand of 14,985 dollars, with interest. He clearly mistook the terms as to the ship, but he had colour for the latter construction. *Kauman,* by his letter of the 6th of *February,* appears to have communicated the answer of the plaintiff to *G. S. G. & Co.,* for he says, that they cannot assign the ship, (and gives the reason,) but that they were about executing, in due form, the transfer of the cargo, policies, and proceeds. Nothing is said as to what *extent* of demand

the assignment is to cover. It is only added, that it was to be for the joint benefit of the plaintiff and *K.* This silence of *G. S. G. & Co.* on the 6th of *February*, after they had been duly apprized of the plaintiff's understanding of their proposal, and after they had corrected it, as to the ship, and only as to the ship, is decisive of their assent to his demand, that the assignment should cover his whole responsibility. I consider *K.*, in this transaction, to have been as much the agent of *G. S. G. & Co.*, as of the plaintiff. He was their mutual agent, and when the assignment was made on the 7th of *February*, and in general terms, without designating any particular part of the plaintiff's claim to which it was to be confined, the construction is no less just than legal, that it covered his *whole* responsibility, to the amount of the 14,985 dollars. Here, then, the plaintiff acquired a right vested and absolute, by the assignment of the 7th of *February*, and nothing but some subsequent act of his, done freely, and with an understanding of all his rights, could deprive him of that legal security.

But the plaintiff, when he came to be duly informed of the contents of the assignment, was dissatisfied, that *K.* had taken it, not for the plaintiff alone, but for their *joint* benefit, and this led to some correspondence between them. This difficulty was, however, soon removed, for *Kauman* in his letter to the plaintiff, of the 14th of *February*, says, that the plaintiff was perfectly safe, for though the transfer was in their joint names, yet it was intended only to secure the surplus to *K.*, after the plaintiff was secured *the whole amount of his claim.*

We are next to see, whether the plaintiff subsequently deprived himself of the benefit of this assignment. As it then stood, it was for the security of his whole demand, to be first and exclusively paid. This was precisely his declared object from the beginning, and it is scarcely possible to believe, that he would afterwards, intentionally and

freely, part with this great and just advantage, for a *pro rata* dividend, under the deed of the 28th of *February*.

The letters from the plaintiff of the 6th, 9th, 12th, 13th, and 14th of *February*, all speak the same language. They all show his clear and decided intention to have the assignment as a cover for his whole demand, and to make that assignment a *condition* of his furnishing funds to take up the *February* bills. His object in sending on his friend *Pascaulf* was for explanation, while he was under the impression that the assignment was not for his exclusive benefit. This appears from his letter to *Kauman* of the 19th of *February*, in which he says, that the explanation given by *K.* that he was only to come in for the surplus, after the demands of the plaintiff were satisfied, superseded the necessity of sending on *Pascaulf*. It is worthy of notice too, that in this last letter, he relies upon the assignment of the 7th, and wishes to have it recorded, so as to give it due validity.

The arrival of *P.* at *New-York* opens a new scene in the history of this transaction, in which the deed of the 7th of *February* is, somehow or other, and certainly not with the consent or knowledge of the plaintiff at the time, put out of existence, and the plaintiff left to look for his indemnity; as a *pro rata* creditor only, under the deed of trust of the 28th of *February*.

The plaintiff, by letter of the 14th of *February*, informs *G. S. .G & Co.*, that the assignment of the 7th of *February* was not what was agreed to, as it ought to have been in his name only, for the whole of his demand, and that he sent on his friend *P.*, in order *to settle the business in his name, to their mutual satisfaction*, and he trusted that *G. S. G. & Co.* would give *him the satisfaction* he had a right to expect. This letter, it is admitted, contains all the powers of *P.* who was a *Frenchman* of advanced age, and so little versed in the *English* language, that an interpreter was requisite to explain part of the conver-

vations. This is proved by *Nathan,* a witness for the defendant.

It is pretty evident that the mission of *P.* was to obtain such security as the plaintiff had looked for under the deed of the 7th of *February,* which security he had discovered, by the explanatory letter of *Kauman,* of the 14th of *February,* (the same day on which the plaintiff had sent on *P.*) did really exist under that assignment. If *P.* was to settle the business to their *mutual satisfaction,* the settlement was to depend upon their mutual *ratification.* That letter never authorized *P.* to give up a vested right under the deed of the 7th of *February,* until some new security was actually given, equivalent in its effects, or, at least satisfactory to both parties; and, certainly, when the letter of the 19th of *February* to *K.* was received, (which must have been, according to the course of the mail, on the 20th of *February,*) it superceded all further negotiation with *Pascaulf.* The plaintiff had then ratified the assignment of the 7th of *February,* and I consider every communication to *K.* as equal to a communication with *G. S. G. & Co.,* for he was as much their agent as the plaintiff's, in the whole negotiation. At what precise time the assignment of the 7th of *February* was given up by *K.* to *G. S. G. & Co.* to be cancelled, does not distinctly appear. If it was done before the new assignment was executed on the 28th of *February,* it was done with too much precipitation. No prudent man would part with one security, until the substitute was prepared and executed. The defendant's witness, *Seixas Nathan,* says, that the new assignment was executed when it bore date, which is on the 28th of *February,* and this was probably after *P.* had left *New-York,* on his return to the plaintiff. Yet it is singular, if not astonishing, to learn how *G. S. G. & Co.* and *K.* had arranged matters as early as the 20th of *February.* By a letter to the plaintiff of that date, *Kauman* says that *G. S. G. & Co.* wish to pay all their creditors alike, and refuse any new transfer to the plaintiff alone, and that he and *P*

had already called on Mr. *Jones* to consult and agree about a new assignment to pay the plaintiff with a number of other creditors, rateably. This letter was eight days before any new assignment was executed; yet *Kauman* says, *the first transfer, by this arrangement, was rendered null and void.* This letter was also written six days after *K.* had agreed that the deed of the 7th of *February* was for the prior and exclusive benefit of the plaintiff, and that he was only to take the surplus; and it was written long after *G. S. G. & Co.* had declared that the plaintiff's claim should be privileged, if he would furnish remittances to take up the *February* bills. It appears to me, that *G. S. G. & Co.* had, by this time, discovered that the assignment of the 7th of *February* was inconvenient to them, though it had answered one of their objects, viz. the receipt of funds of the plaintiff to take up their *February* bills. It appears to me, also, that *Kauman* had become dissatisfied with his explanation of the 14th, that the plaintiff was to be first paid, and was the willing instrument of *G. S. G. & Co.* in destroying that assignment. Why declare so prematurely, that the first transfer had become null and void? and why not arrest all this new arrangement, after the receipt of the plaintiff's letter of the 19th of *February,* saying that he was satisfied with the transfer? The answer of *Kauman,* which is also the answer of *G. S. G. & Co.* says, the deed of the 7th of *February* was destroyed *before* the receipt of the letter of the plaintiff, of the 19th of *February.* Such a premature destruction of it is, in my judgment, a very strong mark of fraudulent design.

*P.* says, that he was informed, on his arrival in *New-York,* by *K.,* that the deed of the 7th of *February* was destroyed. He denies that he had any authority to cancel that deed, or that he ever consented to it, or ever saw it, or that he ever saw or knew the contents of the second assignment. He never had or assumed any authority, and was only sent, as a friend of the plaintiff, to receive payment, or to take security for the plaintiff singly. *Seixas Nathan* (who was

ut that time one of the house of *G. S. G. & Co.*) contra-
dicts the testimony of *P.* in several particulars, and says
*P. did* agree to the deed of the 28th, and to the surrender
of the first deed, and *did* act as the authorized agent of
the plaintiff.

There are several circumstances in the testimony of
*Nathan* which affect its credit. He admits that *P.* left
*New York* for *Baltimore* the latter end of *February*, and,
therefore, he probably left it *before* the execution of the
second deed. He says that Mr. *Jones* asked *P.* if he was
willing that *all that had been done should be considered as
void;* and he said he was, and that the deed of the 7th, was
*afterwards* destroyed; and yet Mr. *Jones* confesses that he
never saw or heard of the deed of the 7th of *February*, un-
til after the execution of the deed of the 28th of *February*.

I cannot resist the impression, that the deed of the 7th
of *February* was surreptitiously and fradulently cancelled,
by arrangement between *G. S. G. & Co.* and *Kauman*,
and that *Pascaulf* was not duly authorized, and never
consented to destroy that deed, and that the plaintiff never
gave his free and voluntary assent to it.

The plaintiff, by his two letters of the 24th of *February*,
insists on adhering to the deed of the 7th, and expressly
dissents from the new arrangement, and expresses himself
with the true feeling and just indignation of a man on
whom the grossest imposition had been practised.

His acquiescence, afterwards, in the destruction of the
first, and in the substitution of the second assignment, was
the acquiescence of despair, and a submission to des-
tiny. *If the thing be not practicable,* says he, (that is, to
be secured according to his original expectation and de-
mand,) *I must at last submit.* In one of these letters, he
says, he will not provide for the *March* bills, without the se-
curity of the 7th of *February;* and yet in a letter of the 1st
of *March*, *K.* informs him that *G. S. G. & Co.* hinted that
unless he would provide for these *March* bills, he would not

be considered a privileged creditor. This was an unjust threat and cruel sarcasm to an injured creditor, whom they had made the victim of their intrigues, and whom they held in a kind of duress. To talk of the plaintiff's free and voluntary ratification of the second assignment, and surrender of the first, is idle and absurd. Every thing that he said afterwards was extorted from him by necessity. His letter of the 26th of *March* speaks of his rateable share of the proceeds; but in his letter of the 13th of *April,* he requests payment out of the proceeds, if not of the whole, at least of part of his demand; and in his letter of the same date, to *G. S. G. & Co.* he claims from them the payment of his advances out of the proceeds. These letters cannot conclude him from resorting to his title under the deed of the 7th of *February.* They were written under mistaken impressions, that his rights had been sacrificed and lost, beyond redemption. His dissatisfaction and constant uneasiness, under the pressure of the impositions practised upon him, are very apparent from those very letters; for in that of the 13th of *April* to *Jones* and *Kauman,* he extends his demand to the whole of the proceeds, and so he does in his letter of the same date, to *G. S. G. & Co.*

My opinion, accordingly, is, that the plaintiff is entitled to the full benefit of the assignment of the 7th of *February,* 1811, and in preference to the defendant, *Kauman ;* and that he is to be first and exclusively paid, out of the property therein assigned, to the extent of his whole demand, and that the deed of trust of the 28th of *February,* 1811, so far as it is inconsistent with the provisions in the deed of the 7th, or with the right of the plaintiff to be paid as aforesaid, is, and ought to be, null and void. That the plaintiff may take such an order of reference as the nature of his case may seem to require. That the defendant, *Kauman,* account for the proceeds, under that assignment, with costs of suit, and that the bill, as to the defendants, *Gom-*

*pert S. Gomperts, Israel B. Jacobs,* and *Seixas Nathan,* be dismissed without costs; and that the bill, as to the other defendants, viz. *Samuel Jones,* jun. and the defendants, who are creditors, be dismissed with costs, to be paid out of the surplus funds, (if any,) after the demand of the plaintiff has been previously paid.

Decree accordingly.